GLORIA ROSENTHAL, Appellant, v QUADRIGA ART, INC., Respondent. [894 NYS2d 32]—

On or about August 4, 1994, plaintiff's decedent, Alfred Rosenthal, entered into a contract with defendant to sell defendant's products for a 10% commission. The contract, that defendant's president, Thomas Schulhof, an attorney, prepared, stated:

"The term of this agreement shall commence on September 1, 1994, and shall be in effect for one year, at which time it will automatically renew from year to year. However, either party has the right to terminate this agreement, upon thirty (30) days notice in writing by either certified or registered letter. However, no notice can be given for the first sixty (60) days of contract.

"However, in the event of termination, the following shall survive:

"a. You shall agree not to solicit any Quadriga accounts for a three-year period following the date of notice of termination.

"b. Quadriga agrees to pay commission to you on any accounts introduced to Quadriga, not previously served by Quadriga, by you and which were being serviced by you at the time of termination and for which orders are shipped during the same three-year period."

Thus, the letter agreement provides that it would automatically renew for one-year periods unless either party gave a 30-day notice of termination in writing. Upon termination, Alfred agreed he would refrain from soliciting defendant's clients and defendant agreed to continue to pay certain commissions to

decedent, both for a three year period. The parties worked together, pursuant to the contract, until July 4, 2004, when Alfred passed away.

On or about November 9, 2006, plaintiff commenced this action claiming entitlement to commissions on the theory that the contract terminated upon Alfred's death and that, pursuant to the contract, defendant was obligated to pay three years' worth of commissions. On or about November 29, 2007, plaintiff moved for partial summary judgment. Defendant cross-moved for, among other things, partial summary judgment with respect to payments allegedly due after Alfred's death. The motion court denied plaintiff's motion and granted defendant's motion for summary judgment dismissing the case. Noting that "no one solicits accounts after death," the court interpreted the agreement to mean that the payments for three years was in return for decedent refraining from soliciting defendant's accounts. Because Alfred had died, there would be no solicitation and therefore no commissions.

The motion court was correct. The posttermination payments are clearly in exchange for plaintiff agreeing not to compete. There is no provision that states or even implies that plaintiff's death will entitle his estate to collect three years in postdeath payments (*Sodus Mfg. Corp. v Reed,* 94 AD2d 932, 933 [1983]). Moreover, decedent never adhered to the procedures for termination, namely "thirty (30) days notice in writing by either certified or registered letter." Without a proper termination, the obligation to pay commissions is not triggered.

We have considered plaintiff's remaining contentions and find them unavailing. Concur—Sweeny, Moskowitz and Richter, JJ.

Saxe, J.P., and Acosta, J., concur in a separate memorandum by Saxe, J.P., as follows: Issues of contract interpretation can be troublesome even where the contract is short and facially uncomplicated. In this appeal, we are asked to decide whether the words "in the event of termination" in the contract between defendant and plaintiff's decedent refer only to termination on the terms provided for in the immediately preceding paragraph, or whether those words should be understood to include termination of the contract by reason of one party's death.

Alfred J. Rosenthal entered into a contract with defendant Quadriga Art in August 1994, in which it was agreed that beginning September 1, 1994, he would sell defendant's products for a 10% commission. The written contract, prepared by defendant's president, included the following provisions:

"The term of this agreement shall commence on September

1, 1994, and shall be in effect for one year, at which time it will automatically renew from year to year. However, either party has the right to terminate this agreement, upon thirty (30) days notice in writing by either certified or registered letter. However, no notice can be given for the first sixty (60) days of contract.

"However, in the event of termination, the following shall survive:

"a. You shall agree not to solicit any Quadriga accounts for a three-year period following the date of notice of termination.

"b. Quadriga agrees to pay commission to you on any accounts introduced to Quadriga, not previously served by Quadriga, by you and which were being serviced by you at the time of termination and for which orders are shipped during the same three-year period."

Alfred worked for Quadriga until his death on July 4, 2004. In this action, brought by his widow, it is alleged that under the terms of the contract, his estate is entitled to continued payments for three years as required by subparagraph (b) of the contract, which obligation plaintiff contends survived when the contract was terminated due to Alfred's death.

Plaintiff requested partial summary judgment seeking a declaration that the employment contract terminated upon Alfred's death and that, pursuant to the contract, defendant was therefore obligated to pay three years' worth of commissions from the date of termination—in this instance, the date of his death. Defendant cross-moved for partial summary judgment dismissing the claim for payments allegedly due after Alfred's death, contending that the clear and unambiguous language of the contract demonstrates that Alfred's death did not create any right for his estate to receive postdeath payments.

I conclude that the motion court was correct in granting defendant's application.

The applicable rules of contract interpretation are undisputed. "[O]ur role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further" (*Evans v Famous Music Corp.*, 1 NY3d 452, 458 [2004]).

Each side suggests a different "plain meaning" of the word "termination" and the phrase "in the event of termination." However, the existence of a disagreement about the "plain meaning" of the words does not necessarily render those words ambiguous for purposes of construing the contract (*see Graev v Graev*, 46 AD3d 445, 451 [2007], *revd and remitted* 11 NY3d

262 [2008]). Rather, we must decide whether the intended meaning of the words is plain by considering their use in context (*id.*). "[A]greements should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases" (*Bailey v Fish & Neave,* 8 NY3d 523, 528 [2007]; *see also South Rd. Assoc., LLC v International Bus. Machs. Corp.,* 4 NY3d 272, 277 [2005]). In doing so, we must be careful not to add new terms or alter the terms of the contract in the guise of interpreting it (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.,* 1 NY3d 470, 475 [2004]; *Reiss v Financial Performance Corp.,* 97 NY2d 195, 199 [2001]).

Our obligation, then, is to examine the contract as a whole, and in particular, the two above-quoted paragraphs in that context. Plaintiff essentially asserts that Alfred's death constituted a termination of the contract, just as would a 30-day written notice of termination, so as to invoke defendant's contractual obligation to pay three years' worth of continued commissions on his accounts. Plaintiff contends that we must employ the dictionary definition of the word "termination," which she says is "an end of time or existence" (citing Merriam-Webster's Online Dictionary), and reasons that the death of a party would constitute such an end in time or existence. She goes on to argue that the word "termination" as used in subparagraph (b) must be construed to include termination by the death of a party to the contract. She adds that any ambiguity in the meaning of the word "termination" as used in subparagraph (b) must be construed against Quadriga, who drafted it.

Plaintiff's proposed interpretation of the contract at issue here is wrong.

Initially, the dictionary definition offered by plaintiff sheds no particular light on the intended meaning of the provision in question. The suggestion that the word "termination" as used in the contract must necessarily include the "foreseeable contingency" of death is incorrect. The foreseeability of death does not automatically make it a means by which the contract, by its terms, may be terminated. Not all contracts are necessarily terminated upon the death of one party (*see Di Scipio v Sullivan,* 30 AD3d 660 [2006]), so the prospect of a party's death is not automatically subsumed in the use of the word "termination."

Plaintiff relies on the rule that while the obligations of an individual to perform pursuant to a personal services contract are excused by that individual's death, the obligations of a corporation to pay for services rendered pursuant to that contract are not excused (*see Matter of Buccini v Paterno Constr. Co.,* 253 NY

256, 258 [1930]). She equates this situation with that considered in *Clark v Gilbert* (26 NY 279, 282 [1863]), in which an employee hired to superintend engineering work, whose wage was to be one third of the profits, died before the work was completed; it was held there that his estate was entitled to recover, as compensation, his one-third share of that portion of the profits that was attributable to the part of the job accomplished during the time he performed services under the contract, up to the time of his death.

Notably, however, the cases on which plaintiff relies concern amounts earned by the estates' decedents for work they performed prior to their death. The commissions discussed in subparagraph (b) of the contract here are *not* compensation earned by Alfred for orders taken by him from his customers during the course of his employment. Rather, subparagraph (b) contemplates continuing to pay commissions based upon orders placed after termination of Alfred's employment, which orders therefore would not have been handled by Alfred.

Ultimately, the assertion that the contract was intended to include Alfred's death as an event of "termination" creating a right to continued commissions is simply too strained an interpretation of this contract. Since employers do not ordinarily continue to pay an employee's estate for work actually performed by others after the employee's death, we would expect a provision which creates such a continuing right to have been specifically negotiated, and that some quid pro quo in exchange for the unusual benefit would be reflected in the agreement. Here, the inclusion of defendant's continuing obligation to pay commissions on Alfred's accounts for three years after his termination is accounted for to the extent it was given in exchange for Alfred's refraining from soliciting those accounts during that same three-year period. Since, as the motion court observed, no one solicits accounts after his or her death, the agreement reflects no other motivation for defendant to provide the continued benefit to Alfred's estate after his death.

The question for this Court to address is not whether death—or indeed, other events such as serious illness—may work a termination of a contract in the abstract. It is whether the plain meaning of the language in subparagraph (b), discerned from examining the context of the words, was intended to cover death as a form of termination.

There is no ambiguity here. The plain meaning of the language "in the event of termination" and the word "termination" may be clearly ascertained from examining the context in which these words are used. In making provision for the

continued payment of commissions after the contract's termination, the parties were addressing the type of termination that they had defined in the preceding paragraph.

In considering the context of the phrase at issue, it is noteworthy that the second paragraph covering the event of termination begins with the word "however." Because "however" is a transitional term, it automatically refers the reader back to the preceding clause. That preceding clause is the one that gives either party the right to terminate the agreement on 30 days notice in writing; it makes no other reference to any other means by which the agreement might be terminated. Reading the two paragraphs together makes plain that the "event of termination" language in the second paragraph refers solely to the termination event that occurs when either side gives the other 30 days written notice of the contract's termination.

That the first paragraph and the second paragraph are related, and that subparagraphs (a) and (b) of the second paragraph are interrelated, is inescapable. The reasonable reading of the two paragraphs at issue is that in the event either party sent a 30-day written notice terminating their contract (albeit not during the first 60 days of the agreement), Alfred agreed not to solicit any of defendant's accounts for three years and defendant agreed to continue paying him commissions for that period on accounts he brought in. I reject plaintiff's suggestion that the period punctuating subparagraph (a) denotes that subparagraph (b) is completely independent of what precedes it, and was intended to apply in the event of Alfred's death. Rather, both subparagraphs come into play equally, and solely, upon either party's terminating the contract by giving the other 30 days' written notice.

This analysis is unaffected by the fact that defendant was responsible for drafting the agreement, since the rule of contra proferentum applies only where there is ambiguity in the meaning of the contract (*see Lesal Assoc. v Board of Mgrs. of Downing Ct. Condominium*, 309 AD2d 594, 595 [2003]), a circumstance not present here.

Finally, this interpretation of the agreement does not, as plaintiff suggests, render subparagraph (b) meaningless. Nor does it, as plaintiff contends, alter the terms of the contract in the guise of interpreting it. The Court of Appeals has explained that "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (*Vermont Teddy Bear Co.*, 1 NY3d at 475 [internal quotation marks and citations omitted]). In *Vermont Teddy Bear* the

Court of Appeals considered a lease provision allowing the tenant to elect to terminate the lease if the premises were rendered wholly unusable by fire or other casualty, and the landlord failed to restore the premises within one year of written notice by the tenant; it rejected an interpretation of the provision that would require the landlord to give written notice of the completion of the restoration within the one-year period, since no such requirement was included in the provision.

The interpretation advanced here does not add a term not present in the contract. Indeed, it would be a modification of the writing, in effect adding a term not present in it, if we were to construe the agreement as making three years' worth of continued commissions payable in the event of Alfred's death, based upon the termination of his *services* rather than the termination of the contract.

For the foregoing reasons, the order on appeal should be affirmed.